**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GILSULATE INTERNATIONAL, INC., a California corporation,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>DRITHERM INERNATIONAL, INC., a New Jersey corporation; JARED SANDMAN, an individual, and DOES 1 through 10, inclusive<br><br>　　　　　Defendants. | CV 13-1012 RSWL (JPRx)<br><br>**ORDER re: PLAINTIFF'S MOTION TO ENFORCE JUDGMENT FOR PERMANENT INJUNCTION AND FOR CONTEMPT ORDER** [51] |

　　Before the Court is Plaintiff Gilsulate International, Inc.'s ("Plaintiff") Motion to Enforce Judgment for Permanent Injunction and for Contempt Order [51]. Having considered all arguments presented, the Court **NOW FINDS AND RULES AS FOLLOWS:**

　　The Court **DENIES IN PART AND GRANTS IN PART** Plaintiff's Motion.

1

## I. BACKGROUND

Plaintiff Gilsulate International, Inc. is the manufacturer of Gilsulate ® 500XR, a pour-in-place insulation material used to provide thermal insulation and corrosion protection for underground piping and geothermal distribution systems, storage tanks, and other structures. Mot. 2:8-12 (citing Declaration of Laura Duncan ("Duncan Decl.") ¶ 2). Gilsulate ® 500XR is composed of coated calcium carbonate (also known as limestone) and other selected, processed, and treated industrial materials. Id. at 12-14. This formula was invented, engineered, and patented to create a product that offers thermal insulation, corrosion protection, and load-bearing capabilities that are unavailable from calcium carbonate alone. Id. at 2:14-17. Defendants Dritherm International ("DTI") and its sole shareholder, and president, James Sandman ("Sandman") (collectively, "Defendants") market a product by the name of "DriTherm." Id. at 2:18-21. DriTherm, comprised exclusively of coated, ground calcium carbonate, is a competing product in the market for pour-in-place insulation. Id.

In 2013, Plaintiff filed an initial action against Defendants for Defendants' alleged violations of sections 43(a)(1)(a) and (b) of the Lanham Act (also known as 15 U.S.C. § 1125 (a)(1)) and related causes of action under California law in connection with the sale and marketing of DriTherm. Id. at 2:23-3:3 (citing

Declaration of Samuel R.W. Price ("Price Decl.") ¶ 2). Plaintiff alleged that in order to compete as an equivalent or alternative to Gilsulate ® 500XR, Defendants published false, deceptive, and misleading information regarding DriTherm. Id. at 3:4-7. Defendants allegedly published false information including false technical specifications and misrepresentations of the characteristics of DriTherm. Id. at 3:7-9 (citing Price Decl. ¶ 2). The primary focal points in the litigation were Defendants' representations regarding the density and thermal conductivity of DriTherm. Id. at 3:9-11. Plaintiff and Defendants stipulated to a permanent injunction ("the Injunction") shortly before the trial originally scheduled in this Action. See Dkt. No. 49.

    Plaintiff now alleges that Defendants have violated the terms of the Injunction. Plaintiff requests an order (1) enforcing the terms of the injunction, (2) holding Defendants in contempt for their violations, and (3) compensating Plaintiff for legal fees it has incurred in its efforts to obtain Defendants' compliance with the injunction. Mot. 2:1-5, 24:11-25:19.

///
///
///
///
///

## II. DISCUSSION

A. **Legal Standard**

**Motion for Contempt**

When a party fails to comply with a court order, civil contempt occurs. See <u>General Signal Corp. v. Donallco, Inc.</u>, 787 F.2d 1376, 1379 (9th Cir. 1986); <u>see</u> <u>also</u> <u>United States v. Rylander</u>, 714 F.2d 996, 1001 (9th Cir. 1983). Federal Rule of Civil Procedure 70 provides that:

> [I]f a judgment directs a party to . . . perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done by the party . . . and may in proper cases adjudge the party in contempt.

Fed. R. Civ. P. 70. A party fails to act as ordered by the court when it fails to take "all the reasonable steps within [its] power to ensure compliance with the [court's] order." <u>Shuffler v. Heritage Bank</u>, 720 F.2d 1141, 1146-47 (9th Cir. 1983)

"The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." <u>In re Bennett</u>, 298 F.3d 1059, 1069 (9th Cir. 2002). "In determining whether the contemnor violated the stay, the focus 'is not on the subjective beliefs or intent of the contemnors in complying with the order, but whether in fact their conduct complied

4

1  with the order at issue.'" In re Dyer, 322 F.3d 1178,
2  1190-91 (9th Cir. 2003)(quoting Hardy v. United States,
3  97 F.3d 1384, 1390 (11th Cir. 1996)); accord McComb v.
4  Jacksonville Paper Co., 336 U.S. 187, 191 (1949) (Civil
5  contempt serves a remedial purpose and therefore the
6  defendant's subjective intent in doing the prohibited
7  act is irrelevant.)  Thus, the contemptive behavior in
8  question "need not be willful" and "there is no good
9  faith exception to the requirement of obedience to a
10 court order."  In re Dual-Deck Video Cassette Recorder
11 Antitrust Litigation, 10 F.3d 693, 695 (9th Cir. 1993)
12 (citing In re Crystal Palace Gambling Hall, Inc., 817
13 F.2d 1361, 1365 (9th Cir. 1987)).  However,
14 "substantial compliance with the court order is a
15 defense to civil contempt, and is not vitiated by a few
16 technical violations where every reasonable effort has
17 been made to comply"; therefore, a party should not be
18 held in contempt if its action "appears to be based on
19 a good faith and reasonable interpretation of the
20 court's order."  Id. (citing Vertex Distrib. Inc. v.
21 Falcon Foam Plastics, Inc., 689 F.2d 885, 889 (9th Cir.
22 1982).
23     In a civil contempt proceeding, the petitioner must
24 first establish a prima facie showing of contempt by
25 demonstrating respondent's failure to comply with the
26 court order by clear and convincing evidence.  United
27 States v. Rylander, 656 F.2d 1313, 1318 (9th Cir.
28 1981), rev'd on other grounds, United States v.

Rylander, 460 U.S. 752 (1983). Once the petitioner has established the prima facie case, the burden then shifts to the respondent to show "categorically and in detail" why he is unable to comply. Id. If the respondent satisfies that burden, the burden shifts back to the petitioner to persuade the court that the defendant is in fact able to comply. Id.

**2. Analysis**

Plaintiff contends that Defendants have engaged in several actions that constitute a violation of the Injunction. See generally Mot. First, Plaintiff alleges that Defendants published information that did not comply with the terms of the Injunction. See Mot. 18-22. More specifically, Plaintiff alleges that Defendants quoted and sold DriTherm without presenting mandatory information required by the Injunction and that Defendants employed new testing methods to misrepresent their product, a direct violation of the Injunction. See Mot. 18-21. Second, Plaintiff alleges that Defendants are using or permitting distributors and sales representatives to make or perpetuate false representations regarding DriTherm's abilities and properties. See Mot. 13-18. Defendants' compliance with respect to these issues is analyzed below.[1]

---

[1] Both Plaintiff and Defendants asserted a number of evidentiary objections to certain declarations included in their filings. Because those declarations were not ultimately required to decide the Motion, the objections are moot.

      a.  *Have Defendants published information that does not comply with the terms of the Injunction?*

           i.  *Have Defendants quoted and sold DriTherm without representing mandatory information required by the Injunction?*

Paragraph 1(a) of the Injunction prohibits Defendants from stating or communicating any "installed density" value for DriTherm unless that installed density value represents "the density of DriTherm after installation and compaction under a minimum load of 400 pounds per square foot" and unless "the specifications are supported by appropriate testing density." J. for Stip. Permanent Inj. ("Inj.") ¶ 1(a). The Injunction further defines the terms therein, such as "appropriate testing density." Per the Injunction, Defendants are "entitled to advertise additional densities provided such densities are supported by appropriate density testing adjusted for additional loads." Id. ¶ 1(b).

Plaintiff claims that the above provisions of the Injunction permit representations of densities other than the "installed density" only in addition to, and not in place of, the 400 psf "installed density." Mot. 8:20-9:6; Reply 5:16-28 (citing Inj. ¶ 1(a-b); Price Decl.). Defendant DTI admits that it has offered "no load density" values in marketing its product, but disputes that it can only offer these "no load density" values in addition to the "installed density" values, instead of as an alternative to the "installed density"

1  value.  See Opp'n 21:4-9.  Defendant DTI also admits
2  that it briefly used a "default density" value while it
3  was waiting for laboratory testing of its product, and
4  contends that quoting this "default density" value was
5  similarly permitted under the terms of the Injunction.
6  See id. at 22:1-7.
7      The text of the Injunction does not support
8  Plaintiff's interpretation.  The Injunction plainly
9  states that any quotation of an "installed density"
10 must meet the specifications of Paragraph 1(a).
11 However, the use of the word "additional" in Paragraph
12 1(b) does not convey the idea that Defendants may not
13 cite any other densities unless it first cites the
14 "installed density" value.  Obviously, additional may
15 mean "in addition to," but it also may commonly mean
16 "other."  In stating that Defendants are "entitled to
17 advertise additional densities provided such densities
18 are supported by appropriate density testing adjusted
19 for additional loads," Inj. ¶ 1(b), the Injunction
20 does not clearly preclude discussion of other types of
21 density values without an accompanying "installed
22 density" quotation, as Plaintiff contends.  A more
23 reasonable interpretation is that Defendants may not
24 cite an "installed density" unless it meets the
25 specifications of Paragraph 1(a), but they may cite
26 other types of density values, provided those values
27 are supported by appropriate density testing.
28 Accordingly, Defendants, in citing "no load" density

and "default density" values, in lieu of the "installed density" value, did not violate the terms of the Injunction.

          ii.  *Have Defendants employed new scientific methods to misrepresent their product in violation of the Injunction?*

Defendants have conducted a series of tests since the entry of the Injunction and have prepared and submitted reports based on those tests. Plaintiff disputes that these tests were compliant with the terms of the Injunction. Plaintiff bases this contention off of two main complaints: first, Plaintiff's own expert conducted independent testing that lead to results in disagreement with Defendants' tests; second, Plaintiff has identified certain aspects of Defendants' testing methodology that, according to Plaintiff, do not comply with the terms of the injunction.

Regarding Plaintiff's first complaint, that its own expert has come to different conclusions regarding the density of DriTherm under the specified conditions, it is difficult for the Court to place great weight on this evidence. Certainly, the results of an expert lend credibility to Plaintiff's suspicions, and the Court is sympathetic to the situation in which Plaintiff finds itself. Thus, the findings of Dr. Phetteplace, Plaintiff's expert, yield inferential evidence that Defendants' values are suspect. However, the Injunction itself specifies certain testing

procedures that Defendants' tests must satisfy, and the mere fact that alternate tests performed by Plaintiff yielded different values does not establish that Defendants have failed to satisfy their obligation to conform their tests to the specifications of the Injunction. While Dr. Phetteplace's testing procedures may be correct according to ASTM procedures, and may even be preferable to the procedures Defendants' experts used, Defendants are not obligated, as Plaintiff contends, to "replicate[]" the procedures used in [Plaintiff's] test," Reply 10:20-21, so long as Defendants' testing procedures follow the requirements of the ASTM as set out in the Injunction. Simply put, different testing procedures may yield different results, and it is not the place of the Court to pick the best testing procedures, but instead to determine whether or not Defendants procedures have complied with the terms of the Injunction. Accordingly, the Court can only find that Defendants have violated the Injunction if there is clear and convincing evidence that Defendants have not followed the required procedures, regardless of the disparity between Plaintiff's and Defendants' test results. Expert testimony about how Defendants' procedures do not follow any established protocols, or replication of Defendants' procedures with different results may yield this type of evidence, but that is not what the Court has before it.

Turning now to the allegations of individual procedural violations, the Court does not find that there is clear and convincing evidence that Defendants' testing procedures constitute a violation of the Injunction. Plaintiff's complaints stem from two alleged violations: first, that the sample Defendants used was not from a bag that was sent to the lab as it appears in the market place (meaning, Defendants' sample arrived in a smaller bag that was sampled from a larger commercially-available bag where the Injunction required the larger commercially-available bag to be sent); and second, Defendants did not abide by the required loading sequence. Regarding the first contention, the Injunction specifies as follows: "Appropriate testing shall mean . . . [t]esting of samples from each source of the DriTherm material, which samples are to be randomly selected from production runs of DriTherm that have been packaged for sale." Inj. ¶ 1(a)(ii). The parties agree that the samples used in the testing did not arrive as the full 50 lb. bag that Defendant DTI uses in commercial sales. The samples came in 15 lb. bags that are not commercially available. Plaintiff contends that this, in and of itself, is a violation of the Injunction, as the provision quoted above requires the samples to arrive in their original packaging. Defendants dispute that Paragraph 1(a)(ii) has this meaning, and instead argue that DTI was only required to send samples taken

from bags of DriTherm packaged for sale.  Opp'n 17:1-20.  Defendants' interpretation is more reasonable.  The Injunction seems to require only that the source of the sample be from DriTherm that has been packaged for sale.  The Court understands this to mean that Defendants could not send a sample that came from DriTherm that had not been packaged for sale-e.g., a separate store of DriTherm that has been set aside specifically for testing.  There is no evidence that Defendants sample was anything other than a portion of a bag that was packaged for sale, and there is no evidence that sending a portion of a commercially available bag, instead of the full commercially available bag, had any impact on the validity of the testing.  Accordingly, this fact does not present clear and convincing evidence of a violation of the Injunction.  With respect to the loading sequence and seating load issues, there is simply insufficient evidence to show that Defendants' sequence and identified seating load are noncompliant with the ASTM when the ASTM itself gives discretion to the testing party to establish the loading sequence, provided it identify that loading sequence.  See ASTM D2435 § 1.3, Def.'s Ex. 2.  Accordingly, the Court cannot, at this juncture, find that Defendants are violating the Injunction's requirements in this arena.  The Court does, however, note that while it does not now have sufficient evidence to find Defendants' testing methods

violate the Injunction, the Court does not forego the possibility that Plaintiff may be able to provide sufficient evidence in the future.

    b. *Are Defendants Using or Permitting Distributors and Sales Representatives to Make and Perpetuate False Representations in Violation of the Stipulated Injunction?*

    Per paragraph 3 of the Injunction, Defendants were to provide, within ten days of the Injunction's issuance, "written notification to all independent distributors identified in the Parties' Settlement Agreement" of the following:

> a. That DTI has been enjoined by the United Stated [sic] District Court for the Central District of California from engaging in certain conduct and making certain representations regarding DriTherm and Gilsulate ® 500XR, along with which a copy of this Injunction issued by the Court is to be provided;
>
> b. That, as a condition of distributing or selling the product, the distributors, representatives, and sales persons must fully comply with all of the terms of the Injunction;
>
> c. That DTI will provide revised product

13

        literature that fully complies with the Injunction;

        d. That the distributors, representatives, and sales persons must immediately destroy all printed materials that do not fully comply with the terms of the Injunction;

        e. That the distributors, representatives, and sales persons must immediately remove any information about DriTherm or Gilsulate products from the distributors', representatives', or sales persons' websites, and replace it only with newly prepared information to be provided by DTI; and

        f.  That distributors, representatives, and sales persons are not authorized to develop or distribute any materials about DriTherm without obtaining prior approval from DTI.

Inj. ¶ 3. Plaintiff contends not that Defendants failed to notify their distributors, representatives, and sales persons of the terms of the injunction, but rather, that Defendants have not, as Plaintiff believes the injunction requires, ceased "selling DriTherm to or

through such persons or entities" that are not complying with the terms of the injunction. Mot. 14:2-5. Otherwise put, Plaintiff contends that because the Injunction requires Defendants to notify their distributors, representatives, and sales persons "that, as a condition of distributing or selling the product, the distributors, representatives, and sales persons must fully comply with all of the terms of the Injunction," Defendants must actually stop selling DriTherm to those agents who do not fully comply with the terms of the Injunction. Mot 13:17-20 (citing Inj. ¶ 3b).

Defendants contend that they have provided notice of the Injunction, that they informally reminded certain resellers of the injunction by email in January 2015, and that they formally resent the required notice in May of 2015. Opp'n 22:16-21. Defendants also contend that despite Plaintiff's contentions, under Paragraph 3 of the Injunction, Defendants' "obligation is limited to providing to certain resellers a copy of the Injunction along with a written notification containing certain statements as specified" in Paragraphs 3(a-f). Id. at 22:22-25. Defendants claim that they did not agree to stop selling DriTherm to agents who violate the terms of the Injunction and that to require them to do so violates their Due Process rights to litigate the issues raised by Plaintiff. See id. at 22:25-23:3 (citing United States v. Armour &

1  Co., 402 U.S. 673 (1971) and Clark v. Coye, 60 F.3d
2  600, 604 (9th Cir. 1995)).
3       Clark, however, assumes the peculiar situation of
4  an injunction enjoining state political bodies and
5  questions the constitutional authority a federal court
6  has over state officers.  Constitutional questions of
7  federal court authority over state officers do not
8  apply here, and thus Clark is limited in its persuasive
9  authority.  Armour more relevantly establishes the
10 proposition that a stipulation must be construed as it
11 is written, but even as such, its result is
12 distinguishable on its facts.  Further, while the Court
13 is aware of the general desire to give effect to the
14 terms of an agreement as they are written, the Court is
15 also aware that with respect to injunctive relief,
16 terms should be interpreted in such a manner as to give
17 effect to their purpose, so that parties cannot
18 repeatedly "work out a plan that was not specifically
19 enjoined" such that "a whole series of wrongs is
20 perpetrated and a decree of enforcement goes for
21 naught."  McComb v. Jacksonville Paper Co., 336 U.S.
22 187, 193 (1949).  And while injunctions should be read
23 narrowly to eliminate only the specific harm alleged,
24 E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d
25 1280, 1297, an injunction should not be read "so
26 narrow[ly] as to invite easy evasion."  McComb, 336
27 U.S. at 193.
28      Taking these principles into consideration, the

16

Court first looks at the language of Paragraph 3 of the Injunction.  Paragraph 3.b requires that Defendants inform their distributors, representatives, and sales persons "[t]hat, as a condition of distributing or selling the product, the distributors, representatives, and sales persons must fully comply with all of the terms of the Injunction."  Inj. ¶ 3.  While this language does not explicitly require that Defendants shall cease to provide these persons with their product should they fail to comply, it is hard to imagine what scenario could possibly invoke the language used in the Injunction and not require Defendants to make actual compliance with the Injunction a condition of distributing or selling the product.  A forceful bluff seems unlikely to have been within the contemplation of the Injunction.  Further, the very conduct this Injunction was created to prohibit includes distributors, representatives, and sales persons peddling misinformation about Defendants' product. Accordingly, the Injunction should be read in such a manner as to reasonably obligate Defendants to require, as a condition of distributing or selling the product, that their "distributors, representatives, and sales persons [] fully comply with all of the terms of the Injunction."

    Defendants assert that this interpretation would require them to "police, attempt to control, actually control, or boycott third party resellers," a

responsibility it did not agree to "under any circumstances." The Court understands the difficulty in controlling third party behavior, and understands that the third-party resellers are not DTI employees or under contract to DTI. However, the language in the Injunction seems clear enough: as a condition of selling or distributing DriTherm, the agents must comply with the terms of the Injunction. Thus, it is incumbent upon Defendants not to control the behavior of the agents distributing their product, but to cease to provide those agents with the product if the agents are found to be non-compliant. Further, despite Defendants' contentions that they simply cannot control these third parties, Paragraph 3(f) seems to indicate that Defendants did contemplate a certain level of control over them, in that "distributors, representatives, and sales persons are not authorized to develop or distribute any materials about DriTherm without obtaining prior approval from DTI." Inj. ¶ 3. Accordingly, Defendants, as a requirement of the Injunction, must cease all sales of DriTherm to or through all parties that have not fully complied with the terms of the Injunction, as well as those parties that do not fully comply with the terms of the Injunction in the future.

### III. CONCLUSION

Plaintiff has not established by clear and convincing evidence that Defendants are violating

Paragraph 1 of the Injunction. Accordingly, Plaintiff's Motion for Contempt Order is **DENIED** as to those grounds. However, the Court finds that to the extent that Defendants have failed to actually condition their provision of DriTherm to their distributors, representatives, and sales persons on observance of the terms of the Injunction, Defendants are in violation of Paragraph 3 of the Injunction. Plaintiff's Motion for Contempt Order is therefore **GRANTED** as to those grounds. Defendants are hereby ordered to comply with the Injunction by ceasing all sales of DriTherm to or through all parties that have not fully complied with the terms of the Injunction to date, as well as those that do not comply with the terms of the Injunction in the future.

**IT IS SO ORDERED.**

DATED: August 25, 2015

RONALD S.W. LEW
**HONORABLE RONALD S.W. LEW**
Senior U.S. District Judge